Our final case this morning is number 231627, Osseo Imaging, LLC v. Planmeca USA. Mr. Quarish, so before you begin, there's a problem with your opening brief, which seems not to comply with the word count requirements of the federal rules. Because as I understand it, it does not count the quoted material from the transcript as part of the word count. And if you do count the quoted material, the brief far exceeds the word count. Okay. Your Honor, I had not considered that. We used a vendor to prepare the briefs and the word count. I did not know that issue you just raised. Okay. I think what happened is that you put the quotes in as a screenshot and that the software improperly doesn't count those screenshot words in the word count, whereas the rules in fact require that they be counted. Okay. I understand. In the future, be careful. I sincerely apologize for that. Okay. Go ahead. May it please the Court. Based on the trial evidence alone from Osseo's own witnesses and documents at trial, the district court's JMO order on obviousness should be reversed. Osseo conceded at trial that all of the claim elements were known, and they admitted so in their response brief in this appeal. As to the claim combination of those elements, the inventor, Dr. Massey, admitted that that combination was known and used in medicine for orthopedics, and that he simply used that combination for dentistry. Indeed, as was shown at trial, Dr. Massey, in a letter to his colleague in late 1999, Did you argue that because these combinations were known for orthopedics that that invalidated the claims of the 301 and 262 because those claims are not limited to dentistry? Yes, Your Honor. We did. Actually, after Osseo's case, before we even put on our case, we approached the judge to move for JMO based on their own admissions. The judge didn't entertain that and punted to later on in the case, but yes, we tried to move for JMO on their admissions alone after their case. Maybe I missed it. I didn't see in your opening brief here that you raised that issue that the patentee's expert here confined his whole analysis to dentistry and didn't consider the fact that these were known in orthopedics and that the claims of those two patents covered orthopedics generally. Actually, in our reply brief, in response to Osseo's arguments, very early on in the reply brief, we had a table which pointed to these admissions that Dr. Massey made regarding just using what was known in medicine for dentistry and the claim language of claim one of the 262 patents. And the 262 patent on their face are not limited to dentistry. The claims are not limited to dentistry. So showing that something was used in orthopedics shows that at least to some extent the claim is perhaps anticipated, certainly obvious over orthopedic prior art. Your Honor, we completely agree with that. Okay, but did you make the argument? That's the question. At trial or in our papers here? In your opening brief here. In our opening brief, I think we referred to the admissions of Dr. Massey where he said it was done in orthopedics and Dr. Akiyos, but we did not make that argument regarding the claim language until in our reply brief, the beginning of our reply brief. We did raise that argument at trial after Osseo's case. Okay. Osseo's expert Dr. Kia also admitted that densitometry to determine bone density was used in medicine and orthopedic applications before 1999. Neither Dr. Kia nor Dr. Massey identified any challenge, unexpected success or unpredictability in using the known combination of known elements that was being used in medicine for dental applications. Dr. Massey specifically testified at trial that densitometry for bone in the mouth would have been the same as densitometry for bone that was done for other parts of the body. He also admitted that his patents described no change in medical diagnostic imaging systems other than taking x-ray equipment in medicine that was known and putting it around a patient's head for dental purposes. That's a direct quote of his trial testimony. We raised these admissions in our J-Mal motion before the district court and the district court's J-Mal order did not address any of those admissions. Further, Dr. Kia, Osseo's expert, did not rebut any of the teachings or combination motivations that our expert, Dr. Pelk, relied on in his obvious discombination of Fontevrade, Mazesse, and Gunther that he put on trial. Thus, Your Honors, not only was there not substantial evidence for the jury's non-obviousness verdict, we submit there was actually substantial evidence for obviousness. Could you point to me, when the case was before Judge Stark on the summary judgment motion, he denied the motion for summary judgment on 103. This is Appendix 3413, where he said, basically, I'm going to let it go to trial on the question of whether or not the proposal would have been motivated to combine and would have had a reasonable expectation. So he's, in essence, saying all the elements are in the prior article. This is the missing element. So could you show me in the record the evidence that you put on as to why there is a motivation to combine with a reasonable expectation of success? A specific testimony, because I had trouble finding it. Your Honor, we had an entire section in our opening brief directed to pointing out all the testimony Dr. Pelk provided. Well, you can test the best you've got. I read it all, and I didn't see specific language pointed to the motivation to combine. Sure. If you look at page 61 of our opening brief, there we discuss what Dr. Pelk, our expert, said regarding motivation to combine the teachings from those references. And then we repeated that same motivation for the other claims that he also provided his obviousness opinion. So what testimony specifically would you have us look at? I mean, there's a lot of testimony here. Do you want us to look at page 4759? Yes, Your Honor. I was looking at that site, Appendix 4759 to 4760. It was one site. Do you want to walk us through it? Sure. Yes, so, Your Honor, starting at line 6 on page 87-873 of the transcript, all the way down to- It's better to stick with the appendix. Okay. 4759, line 6, through 4760, line 24. For example, at lines 20 to 24 of 4760, Dr. Pelk says that many of the advanced CT scanners worldwide may be modified for quantitative CT measurements at relatively little cost. And there he was discussing the Fontebrade reference, which specifically disclosed in 1985 the use of quantitative computed tomography to look and determine bone density, specifically in mass over volume. So that's one example, Your Honor, of where Dr. Pelk discussed combining the teachings of Fontebrade-Mosses with the X-ray dental structure of Gunther. And so it's actually- I think this is clear, but just to repeat it, that one of the motivations to combine these elements was present based on Dr. Massey's own admissions, that this was already being used in medicine. And he wanted it for the same purpose, to detect bone decay, use it for dental applications. And then on top of that, our expert put on his own obviousness combination. And as we discussed in our opening brief, Dr. Pelk- My question, though, is whether there's substantial evidence the other way to support the jury verdict. I would say, Your Honor, no. And that's because, in part, OSSEO's expert did not rebut at all Dr. Pelk's opinions on Fontebrade, Mosses, and the Demoxys reference, which we also used for one of the claims. And with respect to the Gunther reference, which Dr. Pelk, our expert, relied on for the structure of the X-ray equipment for dental purposes, Dr. Kia, OSSEO's expert, did not rebut or take issue with those teachings at all. So our position is that Dr. Pelk's obviousness combination and his motivations to combine those references was unrebutted. Your Honor, unless there's any further questions on the issue of obviousness, I'd like to turn to the issue of a person of ordinary skill in the art that we raised in our brief. In this court's Kia-Serra decision in early 2022, the court held that an expert opining on literal infringement had to be a person of ordinary skill in the art. In this case, based on Dr. Kia's own standard that he set for a person of ordinary skill in the art, he did not meet it. Specifically, he did not... He meets it as an expert, right? He meets it now. Your argument is that at the time of the invention, he didn't satisfy the POSER requirement, right? Absolutely right. And so Kia-Serra doesn't talk about that, right? I agree with you, and we admit that in our opening brief where we say that Kia-Serra does not specifically say that a POSER had to be so at the time of the invention. But our position, our view, Your Honor, is that when you look at Phillips and all the case law that you're familiar with regarding claims having to be analyzed from the perspective of a person of ordinary skill in the art at the time of the invention, that would mean that your expert, at minimum, had to be a person of ordinary skill in the art at the time of the invention. Well, I have trouble with that because I don't see why somebody who acquired expertise later couldn't say this is the state of the art at the time of the invention, and I've learned that through my studies and talking to other people. He didn't do that, Your Honor. Dr. Kia did not do that. He didn't look at the prior art? He looked at the prior art, but he did not say, I went back in time to learn what one of ordinary skill in the art in 1990 would have understood this prior art were these claims to be. He did not do that. Did you bring that out on the cross-examination? Yes, we were trying to prove a negative there. I don't believe, Your Honor, we asked him that specific question, that did you do anything to teach yourself what one of ordinary skill in the art would have known in 1999. Did you ask him about whether he was a person of ordinary skill in the art at the time of the invention? No, we felt like it was evident based on his lack of experience that he didn't meet that skill as of 1999. I don't think that's disputed, that he didn't have the relevant work experience. I'm just asking because it seems like something that, to me, it seems like something that could be used on cross-examination to try to show that the jury should be believing your expert as opposed to the other expert, right? Yes, I agree with you. On direct examination, Mr. Ostro asked him, are you a posita, and he said yes. On cross-examination, when I actually delved into his experience, as we pointed out in our brief, it was clear that he didn't have that three to five years of experience. He had no densitometry or tomography experience, which was part of the standard that he required. At the time of the invention. At the time of the invention. Your Honor, I completely submit that if you were to hold that an expert does not have to be a posita at the time of the invention, we lose that issue. So we're not taking issue that he did not have relevant experience. We're just saying he gained that after the time of the invention. When you put the burden on him to prove that he had sufficient education? Yes, work experience in this case. That's the effect of what you're saying is the burden is on the person who's claiming to be a posita. If they were a posita at the time of the invention, they have to explain why they think they are. Yes, Your Honor. As opposed to that being your burden to disqualify him? Yes, I believe it was incumbent on the proponent of the expert to show that. We haven't decided. That's part of the issue in front of us. Right, I understand. That's what we're asking the court to decide. Okay, do you want to save your time for a rebuttal? Just real quickly, eating into my rebuttal on the issue of densitometry. The district court's construction was clear. We believe to exclude relative color-coded, gray-scaled, qualitative bone density or any density assessment. That is exactly what the acute systems did. We used HU values to render qualitative assessments of linear attenuation of an object. And Dr. Kia at trial admitted that he had not shown any correlation between HU values and actual density. He had shown no mapping between the two. And he had not shown any calculations with respect to HU values being density values, for example, in terms of mass over volume. Unless there's any further questions, Your Honor. Okay. Mr. Ostrom. May it please the court. Good afternoon. It's hard to say, Your Honors. So help me out here. Now look at the 301 patent and the 262 patent. They're on their face, cover dental and orthopedic models and dental and orthopedic structure. So how is it that you're relying on testimony that gives an interpretation of the claim that it's limited to dental applications? I just don't understand that. So this issue isn't really presented on appeal, Your Honor. They didn't brief it. Your Honors were correct that it's just not an issue on appeal. But in any event, the claim does say that it has to include dental, which hadn't been done before. The fact that it may also work on other parts of the body is okay, but it has to at least work on the dental structures, which there was no anticipatory. The claims say one or the other. And if part of the claim covers the prior art, the claim is invalid. I would agree with that as a general proposition, of course, Your Honor. Claim one of the 301 patent says dental and orthopedic structure. It's in the preamble. Claim 260, I'm sorry, claim one of the 262. So you could claim something which covers orthopedic structure, even though that's in the prior art? It was testimony. And, again, this issue is not on appeal, so I'm not sure that it's in the appendix. But just to answer Your Honor's question, Dr. Keo was asked about this. And as I recall, he testified that based on the way the specification was written, that it only disclosed dental imaging, that he understood the orthopedic reference there to be the mandible. There was a lot of discussion. That sounds like an admission. There's a written description requirement. Well, the mandible is an orthopedic structure. It's a dental orthopedic structure. So that he understood it that way. And I don't believe there was any testimony to the contrary. And as Your Honors have said, this issue is not on appeal. In fact, it was never really argued. I don't think you said that. Okay. The issue is not up on appeal. There's no argument being presented that there's an anticipatory reference based on prior art, CBCT with densitometry, that discloses everything in the claims. There's no novelty or lack of novelty or anticipatory argument for invalidity here. So it's not there. Even the argument so-called based on admissions by OSSEO, like Dr. Massey and so forth, that individual components were known, it still requires an obviousness to combine. They were never put together. There was no single reference ever presented at trial or in any argument on appeal that was shown to disclose or argued to disclose all the elements of the claims. So there's going to be a requirement to combine in any event. I do want to say, since we're on the subject, that on page A4846, I asked PlanMECA's expert, Dr. Pelk, so this is, I'll just read it for the record in case you want to look for it. So you have not presented and you're not presenting a separate theory of obviousness of any of the claims based solely on the so-called OSSEO admissions, right? And he said, based solely on the OSSEO admissions, no. What are the OSSEO admissions? That's what Mr. Qureshi just went through, the statements by Dr. Massey, the statements in the patents, the collective, all of that stuff collectively, even Dr. Kia's statements, all of that, the OSSEO admissions were the things that Mr. Qureshi just said. Their own experts said he wasn't presenting that case. The case was not presented, certainly not with any expert support, and it needed it if they were going to argue it because it's not an anticipatory. Did you have expert testimony? There was no motivation to combine? Yes, Your Honor. Where? It's in a number of places. One place is on page A5056. At least it starts there. What page is that? 5056. 5056. Yes. So here, this is during the direct examination of Dr. Kia. Where are we on 5056? So there's a question on line, let's say, three. Why do you believe or disagree with Dr. Pell? Yes, about obviousness. So then Dr. Kia gave his answer, and this is the first part of the discussion, but he talks about, so the prior art, primarily the Weber and the Gunther references, the Gunther is the one that's their primary reference for purposes of appeal, failed to satisfy the bullet five because there was an exhibit at the time. It was one of these elements. So the first bullet applies to both, fails to disclose densitometry. Okay, but I asked you about motivation to combine. Yeah, I'm getting there, sorry. Let me just jump down to the part that's line 16, just to jump to the part of the answer. And he says, and Gunther combined with other references is also not obvious. One of ordinary skill in the art would not look to bone general density for a solution for a problem. Where is the one, okay. One of line 17. And one of ordinary skill in the art would not look to bone general density for a solution for a problem related to somosynthesis, which is what Gunther disclosed. Anything else? I was looking for motivation to combine. I can look to see if that word was used, but that's the essence of what that testimony is about. And this is the best evidence that you can point to that countered Dr. Pelk, which we saw earlier where Pelk was saying he thought he had reasons to combine. That is one example. Is there any other? Yes. Page 5062 and 5069. Where do we see combine? Sorry, one second. I have to scroll to it. So on page 5062, again, this is during his direct, Dr. Kia's direct testimony on rebutting Gunther's. Where is he saying, doctor, I disagree with Dr. Pelk on the motivation to combine? He says, he talks about in line five. Again, I'm just trying to jump to the heart of it. They cannot modify this. One of ordinary skill in the art cannot modify this to add dex and QCT or anything of the sort suggested. So how do you deal with motivation to combine? Then I asked him on line 11. Again, I don't know that those words appear. This is the concept. Well, that's the problem. I mean, that's not the concept. There's a different concept. Okay. The judge on summary judgment said, I'm sending this back so the jury can decide whether there's a motivation to combine these references, which if taken together are going to invalidate. And then motivation to combine with reasonable expectation of success. Pelk's testimony you saw pretty clearly was Pelk saying, here's why I think, and it could have been more elaborate, but he said, here's why I think there's a motivation to combine with reasonable expectation of success. What we're looking for is your counter. The counter relates more to Dr. Kia saying that these technologies would not have been known to work together. Would not have been known what? Would not have been known to work together. They could not work together based on what one of ordinary skill in the art knew at the time. So thus. We're going to say it doesn't work together. So I asked him at line 11, why would it not? Why would it not work? Line 11, which page, sir? I'm sorry, page 5062 still. 5062, line 11. Again, why would it not work to add bone density data or densitometry to his homosynthesis scan? Homosynthesis is what Gunther referenced. Bone density data was from the other prior art, the other references. And then he has an explanation. That's because it's a function of focusing and blurring. You don't get an integration of anatomy in one space so that you can say, okay, this one point has all of my information about the bone. When I scan, I'm just scrolling down a little bit, line 18. When I scan the volume so the detector has certain pixel size, so you imagine an infinite number of rays going in a detector and you do it at another angle, these rays as they intersect, those are what I think are possible points that I can reconstruct. So his argument, so again, on the next page, 5063, I asked him again, are you saying, line 3, page A5063, are you saying that like a tomosynthesis scan and a computer tomography scan are different in this respect? Yes, sir. This whole discussion of all of these pages, let me see, I have also in my notes page 5069. Let me just take a moment. Again, I don't know that he said he disagreed with Dr. Pelk's obviousness combination. He may not have ever used the particular words motivation to combine. I would have to do a search. That's a problem. You had other sites that you were providing earlier. You said 5062, 5063. Did you have another? I just want to make sure. 5069. Okay. Is there something you want to point out on 5069? Again, there's a discussion of the fact that the Gunther tomosynthesis technology would not have been obvious to combine with other references. So like on line 9. 5069, line 9? Yes, this is after the whole technical discussion of the intervening pages. I asked him, so is that the basis for which you disagree with Dr. Pelk and conclude that the patent, Dr. Massey's patents, are not obvious over Gunther combined with other references? Yes. Yeah, but how do we know he's referring to motivation to combine? The part of the discussion, again, his response to that was the non-workability of the two references together would make it not combinable. You have the magic words on 5068. Have you cited that to us yet? Not today, no. I'm glad to see that they're there. 5068, not obvious. Primarily due to the other. Let's go back to our slides. For this reason, not enough. You're asking these reasons to reach a conclusion. It would not have been obvious to combine. Right. Isn't that the best evidence you have? Thank you, Your Honor. Yes, that is a good reference as well. It's just the entire discussion. Well, that's not saying there's no motivation to do it. The word is not there. Our assertion is it was understood this is what he was addressing. Well, the jury got its charge at what stage in the game here? At what stage? Yeah, was the jury charged up front before they go in to deliberate? Yes, Your Honor. But in the specific charge, the judge told them that they needed to consider whether there was reason to combine. Right? Yes. And these pages that I just quickly tried to go through where we said that it would not have been obvious to combine. So what happens if at best there's a tie? A tie? Yeah. Their witness said, right, I think there's a reason to combine these references with a reasonable intention in plain language. Your witness has said, oh, we don't think so. The jury obviously disagreed with you. Right? I'm sorry, I'm not sure I understand. The jury held the patents were not obvious. No. So as long as there's substantial evidence to support the jury's verdict, then we're supposed to uphold it, right? That would be the standard, yes, Your Honor. So if there was a tie in the evidence, you would win because there's substantial evidence to support the jury's verdict. That as well as the fact that this issue is their burden by clear and convincing evidence. So a tie doesn't even get them, doesn't get them there anyway. But in these pages he addressed Dr. Kia, responded that he firmly disagreed that it would have been obvious to combine. So I know I'm running short on time and I don't know. What was the Peltz theory as to why there was a motivation to combine? What was the theory? Yeah. I don't know that I can recite it completely off the top of my head. I think we just looked at it in the record before. That I think I'm hesitant to say it and we can go back and look at the pages in the record. But it was along the lines that one of skill in the art, in his opinion, would have been motivated to include density, bone density data with, you know, the CBCT tomographic model. Why? Was there more to Peltz' statement other than 4759? I don't, I don't think so, Your Honor. In 4759 when asked what was the reason to combine, he said much like what we talked about with the previous combination. I have no idea what that is. So there are two, the two main invalidity arguments were the Weber patent with some prior art combined and the Gunther patent with prior art. So they're citing the one about Gunther. It was the same discussion about Weber. In the record, Dr. Peltz agreed that those two primary references were essentially the same in what they disclosed. So whatever that previous discussion was would be relevant to this concern if we go back and find it. If we can, I'm not even sure those pages are in the record. Okay, I think we're out of time. Thank you. Mr. Qureshi. Real briefly, Your Honor, in response to some of the questions that you asked of Mr. Ostrow, in the page that he referred to, referred you to 4846 where he said that Dr. Peltz on cross said that he didn't base his opinion solely on Ostrow's admissions. If you go a little further below at line 13, he expressly says that he viewed those admissions in providing his obviousness opinion as to what was known in the state of the art. Additionally. So a motivation to combine. What does your witness say was the motivation? I thought Dr. Peltz, as we cited in our opening brief, specifically said you could take the X-ray structures that were known in the Gunther reference, the X-ray machine, the computer, the input, the output, and use that for computed tomography. That's not the question on motivation. It's not whether you could do it. It's whether you would do it. What did he testify was the reason they would do it? Is there something beyond 847.59? That was the reference to Fontevraud, the 1985 reference, where it said you could take an existing CT scanner and use it for QCT to determine bone density. And he combined that motivation that you would want to determine bone density using conventional CT scanners to combine with the X-ray structure for dental purposes. Where is that? Could you give us a website? Yes, that was what I pointed to when I first came up, Your Honor. Let me see if I can find it real quick. I believe you're the one who referenced me to that page. That's 47.59 to 47.60. Okay. So what he says here is the hardware are the same sort of components. They all use electrical detectors. They all have computers. They're in the same field in the body imaging, and there's no unexpected results. Is that the reason to combine? Yes, and then at the bottom of that passage on 47.60, he concludes by saying it would have been easy to modify the structure of Gunther to achieve the QCT purpose to determine bone density as disclosed in the Fontevraud reference. This is going from 47.59 to 47.60? Yes, Your Honor, at the bottom of 47.60. I don't see where it says easy. I believe I'm sorry. He said at relatively little cost, and then he said they're telling you this is easy to implement. Can you tell me what page you're looking at, what lines? Sure, 47.60 lines 23 to 24. 47.60, Your Honor. 47.60? Yes. 23? The sentence starts at line 20 and ends at 24. Your Honors, with regard to the one thing Mr. Ostrow pointed out in response to your questions about whether there was a motivation to combine, the only specific thing I heard him say was that Gunther didn't disclose tomosynthesis. I'm sorry. Gunther was a tomosynthesis reference. Gunther says nothing about tomosynthesis. So on top of that, Dr. Pelk did not rely on the Gunther reference for tomography, for the tomographical and densitometry limitations that were construed by the district court. Dr. Pelk relied on the Fontevraud and Mezes references for those teachings. Again, he only relied on Gunther for the structure of the x-ray system for dental purposes. Unless Your Honors have any further questions, I'll conclude and ask that this court reverse the district court's general decision and render judgment in favor of Gunther. Okay, thank you. Thank both counsel. Case is submitted. That concludes our session for this morning.